**Rose MANFREDI and Frank Manfredi, on behalf of themselves and all others similarly situated**

v.

**Edward H. MAHER, Commissioner of Social Services, State of Connecticut.**

**Civ. No. H–76–76.**

United States District Court, D. Connecticut.

Aug. 1, 1977.

---

Norman K. Janes, Tolland-Windham Legal Assistance, Inc., Willimantic, Conn., Judith Stein Hulin, Charles C. Hulin, Legacy, Inc., Norwich, Conn., for plaintiffs.

Francis J. MacGregor, Asst. Atty. Gen., Carl Ajello, Atty. Gen., State of Connecticut, Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

CLARIE, Chief Judge.

The named plaintiffs[1] have filed this § 1983 action on behalf of themselves and

1. In addition to the original plaintiffs, Frank and Rose Manfredi, the following individuals have taken steps to intervene in this action: (1) Lucy and Arthur Guertin (Apr. 2, 1976); (2) George and Elsa Zipp (July 26, 1976); (3) Jose and Adeline da Silva (aff. July 26, 1976); (4) Lawrence Bogue (Aug. 30, 1976); and (5) Sallie Jacobs (Nov. 24, 1976) (t. r. o. granted). The factual circumstances of all the named plaintiffs in this action are substantially similar.

During May of 1976, Frank Manfredi was obliged to remove his wife Rose for financial reasons from the Hamilton Pavilion nursing home in Norwich, Connecticut. George Zipp, an intervenor, has, since the date of his intervention, become a resident at the Lutheran Home in Middletown, Connecticut, along with his wife Elsa. Jose da Silva died before his intervention papers were completed, and Lawrence Bogue has died since the date of his intervention.

Only the Guertins and Sallie Jacobs therefore retain their original posture with respect to the defendant's contested policy, although Frank and Rose Manfredi might also still retain a claim against the Commissioner, since the

all others similarly situated, to enjoin the defendant, the Commissioner of the Connecticut Department of Social Services (DSS), from enforcing a DSS regulation which calls for interspousal income attributions in determining eligibility for Title XIX (Medicaid) benefits.[2] The effect of the said regulation is to allocate all but $2662 of a qualified couple's yearly income, from whatever source, to institutional support, where one of the spouses is confined for a long term at a nursing or convalescent home. In such a case, the non-institutionalized spouse is obliged to meet all personal and household expenses out of the $222 per month, which remains after the mandatory contribution for institutional support required by the state has been paid.

The plaintiffs are elderly couples, which have one spouse confined to a long-term health care institution. The plaintiffs have filed this action to challenge on statutory and constitutional grounds the DSS's income attribution procedures. They seek class certification and declaratory and injunctive relief. The defendant contends that the plaintiffs have not raised a substantial constitutional issue, and that the Social Security Act (SSA) does not preclude the state's present Medicaid eligibility system.

The Court finds, however: (1) that the plaintiffs have in fact raised constitutional issues which are not insubstantial, thus conferring jurisdiction upon the Court; (2) that the relevant provisions of the SSA, 42 U.S.C. § 1396a(a)(17), precludes the continued assessment of a couple's income on the theory that they maintain a single household, when in fact one member of the couple resides in a long-term medical care facility—spouses living under such separate circumstances must have their incomes treated separately for Medicaid purposes; and

(3) that the "anti-attachment" provision of the SSA, 42 U.S.C. § 407, bars the state from requiring payments for institutional support out of a third party's Social Security income, regardless of financial responsibility. The plaintiffs' prayer for permanent injunctive relief is therefore granted, as is the motion for class certification.

## FACTS

Medicaid is a federally sponsored welfare program which provides medical benefits to those with limited income and resources. *See generally* 42 U.S.C. §§ 1396 *et seq.* In order to qualify for Medicaid assistance, an individual must fall within the eligibility limits for an approved categorical assistance program—such as Title XVI (SSI), Title IV–A (AFDC), or a state supplemental payment plan—either before or after medical expenses are taken into account.[3] 42 U.S.C. §§ 1396a(a)(10). 1396a(f); 45 C.F.R. § 248.

Federal law places certain limitations upon the eligibility criteria which states may impose under Medicaid plans. In particular, 42 U.S.C. § 1396a(a)(17) reads, in its relevant portions:

"A State plan for medical assistance must . . . include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . (B) provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient . . . (C) provide for reasonable evaluation of any such income and resources, and (D) do not take into account the financial responsibility of any individual for any applicant or recipient

change in that couple's circumstances resulted directly from the effects of the DSS's policy.

2. DSS Policy Manual, Vol. III, ¶ D–245, § 1.b.

3. Those with extremely low income and resources, who qualify for such categorical programs directly, are referred to as the "categorically needy." A state may also elect (as Connecticut has done) to provide benefits to the

"medically needy," *i. e.,* those whose income and resources are too great to directly qualify for categorical assistance, but who do meet categorical standards once recognized medical expenses have been deducted. The criteria utilized by Connecticut in assessing Medicaid eligibility are discussed further at note 15 *infra* and accompanying text.

of assistance under the plan unless such applicant is such individual's spouse . . . ."

*See also* 45 C.F.R. § 248.3. The statute thus imposes three separate requirements upon a state plan: (1) the state may take into account only such income and resources as are actually available to the recipient;[4] (2) the state's eligibility criteria must be reasonable; and (3) the state may not take into account the financial responsibility of third parties, except in certain instances, as where the third party in question is the recipient's spouse.[5]

In discussing the first two of these three requirements, the Senate Finance Committee report stated that

"[t]hese provisions are designed so that States will not assume the availability of income which may not, in fact, be available or overevaluate income and resources which are available. Examples of income assumed include support orders from absent fathers, which have not been paid or contributions from relatives which are not in reality received by the needy individual." U.S.Code Cong. & Admin.News pp. 1943, 2018 (1965).

With respect to the third requirement concerning the attribution of income from third parties, including spouses, based on financial responsibility for the recipient, the report stated:

"The committee believes it is proper to expect spouses to support each other . . . . Such requirements for support may reasonably include the payment by such relative, *if able*, for medical care." *Id.* (Emphasis supplied).

Pursuant to this legislative mandate, Connecticut acted the following regulation in connection with its Medicaid plan:

"If the [Medicaid] recipient resides in a medical facility, but is not otherwise separated from the spouse, the amount of income exempted (from the recipient's available contribution) for the support of the community is $2,300 of the couple's combined gross annual income." DSS Policy Manual, Vol. III, ¶ D–245, § 1.b.[6]

The practical effect of this regulation is evident in the case of Lucy and Arthur Guertin, whose experience is representative of the plaintiff class. As reflected in his testimony before the Court on September 7, 1976, Arthur O. Guertin is a retired person in his seventies. His wife, Lucy Guertin, 66 resides at the Hamilton Pavilion nursing home in Norwich, Connecticut, having entered that institution on May 14, 1974. Arthur Guertin has exhausted his savings and borrowed against his insurance policies to support his wife in the home. After these resources were used up, Lucy Guertin applied for and began to receive Medicaid benefits.

Arthur Guertin's total current income consists of a state pension of $179.62 per month, plus $271.90 in Social Security old

---

**4.** The "available resources rule" has a substantial history in case law as well as in legislative enactments. *See generally Buckner v. Maher,* 424 F.Supp. 366, 372–73 (D.Conn.1976) (list of authorities).

**5.** It should be observed from the outset that § 1396a(a)(17)(D) does not *require* interspousal income attribution, nor does it stand for the proposition that the entirety of a spouse's income may be automatically attributed to the other spouse in every instance. The legislative history, cited below, makes this point quite clear. Rather, the language in § 1396a(a)(17)(D), which refers to spouses, merely provides that the blanket prohibition which is imposed in that subsection upon such income attributions as are predicted on financial responsibility shall not act as a *total* barri-

er to all income attributions as between spouses.

To hold that § 1396a(a)(17)(D) provides the state total freedom in attributing income between spouses would ignore not only the legislative history of the SSA, cited below, but also the plain language of 42 U.S.C. § 1396a(a)(25), dealing with financial responsibility. The implications of this latter provision on the present case are discussed in detail later.

**6.** The $2300 figure has now been effectively raised to $2662 through an action of the Connecticut General Assembly. Conn.P.L. 76–200. Whereas a non-institutionalized spouse was only able to retain $192 per month at the outset of this litigation, the General Assembly passed an additional "disregard" which raises the monthly level to $222.

age benefits.[7] Of the $451.52 per month thus received, Arthur Guertin must contribute $229.52, or somewhat more than half of the total amount, toward his wife's support in the nursing home. Should he refuse to make such contributions, Lucy Guertin would be denied Medicaid assistance, with the result that she would ultimately be forced to leave the home. After making the contributions required by the state, Arthur Guertin is left with $222 per month out of which he must meet all personal and household expenses.[8]

The impact of this financial privation upon Arthur Guertin's life style has been pronounced. Guertin testifed before the Court that he has been obliged in recent months to subsist on the equivalent of one and one-half meals per day (coffee and toast in the morning, a "light lunch" during the evening, and sometimes a sandwich at noon). He has been unable to afford the cost of a low-salt diet, and a doctor has ascribed a recent illness to the plaintiff's failure to maintain such a diet. In order to conserve on energy costs, Guertin reportedly restricts himself to one bath a week, and uses a single 60-watt bulb for illumination in the evenings when needed, but he also sits in the dark for long hours with no lighting at all. Despite these measures, Guertin is unable to meet utility payments. Indeed, his various expenses are such as to leave him perpetually in debt, dependent on such help as he occasionally receives from relatives. It has been suggested to Guertin that he could solve his financial problem by divorcing his wife, but he refuses to do so,

and thereby continues to be subject to the state's income attribution rule.[9]

The plaintiffs argue that the contested DSS regulation violates the due process and equal protection clauses of the fourteenth amendment, by attributing income from one spouse to another without regard to their living arrangement or ability to pay, and by arbitrarily and irrationally assigning medically separated married persons to a class which receives discriminatorily harsh treatment from the state. They further argue that the contested regulation violates the restrictive conditions written into the SSA, 42 U.S.C. § 1396a(a)(17), as discussed above.[10] The defendant on the other hand maintains that the categorization set up by the DSS regulation is neither arbitrary nor irrational, and indeed is fully authorized under *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), and related cases. The state further maintains that its rule comports satisfactorily with the statutory restrictions set out in the SSA, 42 U.S.C. §§ 1396a(a)(17) and 1396a(a)(25).

As a separate ground for relief, the plaintiffs cite 42 U.S.C. § 407, which provides:

"The right of any person to any future payment under this subchapter shall not be transferrable or assignable, at law or equity, and *none of the monies paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.*" (Emphasis supplied).

---

**7.** In addition, Lucy Guertin receives $218.20 each month from Social Security, independent of her husband's benefits. Of this, all but $25 per month is allocated to institutional support.

**8.** This $222 per month figure is applicable to all individuals in the plaintiff's position, regardless of the size of the monthly benefit payment. While it is true that Arthur Guertin is eligible to receive food stamps and Medicaid benefits for himself, his income still falls well below the poverty line.

**9.** It is not clear that a dissolution of marriage will always be allowed in cases of this type. In *In re Bennington*, Cause No. 576–260 (Super. Ct., Lake County, Ind. May 26, 1976), the court ordered further hearings on an attempted marriage dissolution by a couple faced with a state welfare regulation of the type promulgated in Connecticut, stating that "should [the state's] regulations be valid it is not clear that the parties should be permitted to circumvent [them] by going through a dissolution." Slip op. at 3.

**10.** A recently adopted HEW regulation precludes state regulations of the type adopted in Connecticut in a great majority of the states. 42 Fed.Reg. 2684 (Jan. 13, 1977). The regulation is not directly applicable in Connecticut, however. For a further discussion, see note 14 *infra* and accompanying text.

The plaintiffs contend that—apart from any other arguments put forth in the case—this statute precludes the state from requiring by way of administrative compulsion, that an individual be compelled to contribute such income as he or she receives through Social Security benefits to the support of an institutionalized spouse. In response the defendant argues that the case law under § 407 fails to support the plaintiffs' contention, and that no case law precedent has yet permitted a spouse to refuse support to his or her married partner through a reliance on that statute.

### ISSUES

(1) Whether or not the plaintiffs have alleged a not insubstantial constitutional claim, so as to vest the Court with jurisdiction under 28 U.S.C. § 1343(3);

(2) Whether the challenged regulation is inconsistent with the terms of the Social Security Act; and

(3) Whether 42 U.S.C. § 407 precludes the state from predicating an institutionalized spouse's Medicaid eligibility upon the receipt of payments from the non-institutionalized spouse, derived from the latter's Social Security income.

### DISCUSSION OF THE LAW

(A) *Threshold Questions*

■ The plaintiffs allege several constitutional claims under the due process and equal protection clauses of the fourteenth amendment. Under the due process clause, they argue that the contested DSS income

attribution regulation is defective in that it assumes the availability of the non-institutionalized spouse's income without examining such spouse's ability to pay. *Cf. Owens v. Roberts*, 377 F.Supp. 45 (M.D.Fla. 1974) ("available income rule" upheld on due process grounds). Under the equal protection clause, it is asserted that the state's treatment of Medicaid applicants who are both married and retired is discriminatorily harsh.[11] The defendant counters these arguments primarily by reference to the states' broad prerogatives to set welfare benefit levels as established in *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), and related cases. *See, e. g., Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Johnson v. White*, 353 F.Supp. 69 (D.Conn.1972), *rev'd in part and rem.*, 528 F.2d 1228 (2d Cir. 1975).

In order for a defendant to defeat federal court jurisdiction under 28 U.S.C. § 1343(3), it must be shown either that the plaintiff's arguments are directly precluded by controlling authority, or else that they are so clearly insubstantial as to warrant no further consideration. *Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973). In the recent case of *Franssen v. Juras*, 406 F.Supp. 1375 (D.Or.1975), which is nearly identical to the case at bar,[12] a three-judge panel found that the plaintiffs' constitutional claims were "not plainly insubstantial," and proceeded to a decision on the merits. *Id.* at 1376 n. 3. While a final disposition of the constitutional claims raised in this action might require close

11. The plaintiffs point out that if the non-institutionalized spouse in a family of the type which comprises the plaintiff class is employed, such non-institutionalized spouse may retain $6439 per year (or $536.58 per month). DSS Policy Manual Vol. I, Ch. III, §§ 344.1–344.2. The defendant maintains that this discrepancy is allowable, since it provides an incentive for non-institutionalized spouses to seek employment. When applied to retired elderly persons, however, the plaintiffs assert that the policy is wholly arbitrary and irrational.

The plaintiffs also note that when spouses are separated by factors other than institutionalization the contributing spouse is required to

provide only one-half of his or her income, and that such a spouse is allowed to keep a minimum of $279.50 per month. DSS Policy Manual, Vol. I, Ch. III, § 345.1. The plaintiffs contend that the distinction between institutionalization and other forms of separation is a constitutionally impermissible basis upon which to assign differential Medicaid benefits.

12. Along with a majority of other states, Oregon uses Supplementary Security Income (SSI) criteria for determining Medicaid eligibility, whereas Connecticut does not. Except for this fact, the situation in *Franssen v. Juras* is entirely analogous to the situation in the present case.

analysis, it cannot be said that they are entirely frivolous under the *Goosby v. Osser* test, and the Court is therefore not without jurisdiction to decide the merits.

█ It would be improper, however, to convene a three-judge panel in this matter, although the action was filed prior to August 13, 1976, since the issues which are raised may be disposed of on statutory grounds. Case law authority has established the principle, that where a case which might normally be decided by a three-judge constitutional court is amenable to a disposition on statutory grounds, a single judge should render decision. *Doe v. Westby*, 383 F.Supp. 1143 (D.S.D.1974), *vac. and rem.*, 420 U.S. 968, 95 S.Ct. 1385, 43 L.Ed.2d 648 (1975); *Hagans v. Lavine*, 415 U.S. 528, 543–45, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Cordova v. Reed*, 521 F.2d 621 (2d Cir. 1975). The Court will therefore proceed directly to a consideration of the merits.

(B) *Substantive Questions*

█ In 35 of the 50 states, the issues before the Court could be resolved by a simple reference to extant regulations and case law authorities. In such states, Medicaid eligibility is linked directly to the criteria used in determining eligibility for the underlying categorical assistance programs—for instance Title XVI, Supplemental Security Income (SSI), or Title IV–A, Aid to Families with Dependent Children (AFDC). *See* 42 U.S.C. § 1396a(a)(10); 45 C.F.R. § 248.1(a)(1)(i). With respect to elderly persons, the SSA specifies that

"[f]or purposes of determining eligibility for and the amount of [SSI] benefits for any individual who is married *and whose spouse is living with him in the same household* but is not an eligible spouse, such individual's income and resources shall be deemed to include any income and resources of such spouse, whether or

not available to such individual, except to the extent determined by the Secretary to be inequitable under the circumstances." (Emphasis supplied.)

That is, except where the Secretary of HEW deems such action to be inequitable, interspousal income attribution is sanctioned by the SSA in determining SSI (and thus Medicaid) eligibility, *where the spouses are living together in the same household.* In interpreting this latter phrase, federal court decisions have held that a spouse who is confined to long-term institutional care is not "living together in the same household" with his or her partner, even though a marriage bond still exists between the two. *Franssen v. Juras*, 406 F.Supp. 1375 (D.Or. 1975); *Burns v. Vowell*, 424 F.Supp. 1135 (S.D.Tex.1976) (preliminary injunction).[13]

Recently, the Department of Health, Education and Welfare (HEW) has issued final regulations interpreting the phrase "living together in the same household" for Medicaid eligibility purposes. 42 *Fed.Reg.* 2684 (Jan. 13, 1977). The new regulation takes one step closer toward the solution of the problem and reads in its relevant portion as follows:

"Where both spouses apply as aged, blind or disabled or where both spouses are SSI eligible, *and cease to live together, income and resources are considered mutually available without proof of contribution for the first six months after the month they cease to live together in a common household. After that, only actually contributed income and resources may be considered in determining the eligibility or amount of assistance of either individual spouse."* 42 Fed.Reg. at 2686, 45 C.F.R. § 248.3(b)(2)(i) (emphasis supplied).[14]

In other words, where both spouses are eligible for SSI benefits (*e. g.*, where both are elderly persons who meet the financial

---

**13.** In light of a recently adopted HEW regulation applicable in Texas (see discussion below), the *Vowell* case has been placed on the long-term inactive list in the Southern District of Texas without a final hearing on the merits.

**14.** If the non-institutionalized spouse is not SSI eligible, there is no six-month waiting period. This anomaly results from the statutory definition of "eligible spouse" incorporated in the SSI provisions of the SSA, 42 U.S.C.A. § 1382c(b).

and other related eligibility requirements for SSI assistance), a state which employs SSI criteria to determine Medicaid eligibility may not attribute income or resources from one spouse to the other after such spouses have ceased to live together in a common household for six months or more. The effect of this regulation upon the present plaintiffs—were it applicable—would be to require the separate consideration of each spouse's income and resources in assessing Medicaid eligibility, after one member of the couple had resided in a nursing home for a period exceeding six months.

The present case may not be resolved by reference to this regulatory provision, how-ever, because Connecticut is one of 15 states which has elected to assess Medicaid eligibility on the basis of a historical standard, by referring to the state's medical plan which was in effect on January 1, 1972. 42 U.S.C. § 1396a(f).[15] SSI eligibility criteria are not employed in such an assessment, and therefore the above-cited rule does not have direct application. Nevertheless, the Court finds that it is unreasonable, within the meaning of 42 U.S.C. § 1396a(a)(17)(C), for a state to assess the income of two persons on the theory that they maintain a single household, when it is a recognized fact that one member of that couple is confined to a long-term medical care facility.[16] Such an assumption flies in the face

15. 42 U.S.C. § 1396a(f) reads as follows:

"Notwithstanding any other provision of this subchapter, except as provided in subsection (e) of this section, no State not eligible to participate in the State plan program established under subchapter XVI of this chapter shall be required to provide medical assistance to any aged, blind, or disabled individual (within the meaning of subchapter XVI of this chapter) for any month unless such State would be (or would have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved under this subchapter and in effect on January 1, 1972, been in effect in such month, except that for this purpose any such individual shall be deemed eligible for medical assistance under such State plan if (in addition to meeting such other requirements as are or may be imposed under the State plan) the income of any such individual as determined in accordance with section 1396b(f) of this title (after deducting any supplemental security income payment and State supplementary payment made with respect to such individual, and incurred expenses for medical care as recognized under State law) is not in excess of the standard for medical assistance established under the State plan as in effect on January 1, 1972. In States which provide medical assistance to individuals pursuant to clause (10)(C) of subsection (a) of this section, an individual who is eligible for medical assistance by reason of the requirements of this section concerning the deduction of incurred medical expenses from income shall be considered an individual eligible for medical assistance under clause (10)(A) of that subsection if that individual is, or is eligible to be (1) an individual with respect to whom there is payable a State supplementary payment on the basis of which similarly situated individuals are eligible to receive medical assistance equal in amount, duration, and scope to that provided to individuals eligible under clause (10)(A), or (2) an eligible individual or eligible spouse, as defined in subchapter XVI of this chapter, with respect to whom supplemental security income benefits are payable; otherwise that individual shall be considered to be an individual eligible for medical assistance under clause (10)(C) of that subsection. In States which do not provide medical assistance to individuals pursuant to clause (10)(C) of that subsection, an individual who is eligible for medical assistance by reason of the requirements of this section concerning the deduction of incurred medical expenses from income shall be considered an individual eligible for medical assistance under clause (10)(A) of that subsection."

See also 45 C.F.R. § 248.1. No legislative history has been located to establish Congress' intentions in enacting this provision.

The foregoing statutory language is a prime example of the opacity of the Social Security Act, upon which Judge Feinberg commented in the recent case of Lynch v. Philbrook, 550 F.2d 793, 795 (2d Cir. 1977), stating:

"Since the welfare statutes now rival the Internal Revenue Code in complexity, one interprets them with less than robust confidence." Slip Op. at 1928.

Such language of necessity may thrust the Court into the role of seer, at best, or, at worst, into the role of a de facto legislative committee. This disquieting trend was recently delineated in Professor Chayes' "The Role of the Judge in Public Law Litigation," 89 Harv.L.Rev. 1281 (May, 1977).

16. In its January, 1977, regulation, the HEW undertook to interpret § 1396a(a)(17)(D) with respect to states electing to use historical eligibility standards under § 1396a(f):

"[A] State plan must . . . [p]rovide that the available income and resources of spous-

of simple, economic reality, as the impoverished lifestyle of the named plaintiffs in this action clearly demonstrates. By comparison, it would be highly reasonable to treat such couples as separate individuals for Medicaid purposes; the non-institutionalized spouse's monthly benefit payments would presumably be reduced to reflect his independent circumstances, on an equal footing with others similarly situated, but none of this lesser amount would be demanded for support of the institutionalized spouse. And, should the institutionalized spouse's health eventually improve, the Commissioner could reassess the level of benefits, upon such spouse's release from institutional care and upon the resumption of the couple's living in one household.

The state contends, however, that the moral obligation of one spouse to another, which is reflected in the mandatory support laws that exist in many states, including Connecticut,[17] authorizes the attribution of a non-institutionalized spouse's income under the state Medicaid plan, even though the couple is not technically living together. Indeed, the state points out that the SSA *requires* it to take account of financial responsibility in assessing Medicaid eligibility. 42 U.S.C. § 1396a(a)(25).

While this argument has a strong initial appeal, it falters under closer scrutiny. It was Congress' intent, as reflected in the legislative history set out above, that spouses be obligated to support each other only "if able." U.S.Code Cong. & Admin.News, pp. 1943, 2018 (1965). Likewise, the Connecticut support statute provides that the Court of Common Pleas shall have authori-

ty to issue support orders "according to [the liable relative's] ability to furnish such support." Conn.Gen.Stat. § 17–320. Further, § 322 of the same title expressly provides that an individual who is the subject of a support order may bring an action at any time to be relieved of such obligation, and the court may amend the order "[i]f said court finds that he, being liable under said section 17–320, is required to contribute an amount beyond his ability . . . ."

The above-cited Connecticut statutes have a direct relationship to Medicaid eligibility. Section 1396a(a)(25) of Title 42 requires that

"the State or local agency administering [the State's Medicaid] plan will take all reasonable measures to ascertain the legal liability of third parties to pay for care and services . . . arising out of injury, disease, or disability, [and] *where the State or local agency knows that a third party has such legal liability* such agency will treat such legal liability as a resource . . . ." (Emphasis supplied.)

Given the discretionary nature of the Connecticut support statutes, cited above, the Commissioner of the DSS can hardly "know" the extent of legal liability which might be assigned by a common pleas judge in cases such as the Guertins'. A compulsory rule which arbitrarily assigns all but $222 per month of the non-institutionalized spouse's income to the institutionalized partner's support cannot be justified on the basis of the Connecticut support statutes. Indeed, the existence of these support stat-

---

es of aged, blind or disabled applicants or recipients . . . must be considered as available in a manner identical to or more extensive than the manner in which such relatives' income and resources must be considered under paragraphs (b)(2) and (3) [*see* text accompanying note 14 *supra* ] of this section. However, such consideration of income and resources may not be more restrictive than that included in the State's January 1972 title XIX plan."
HEW thus endeavors to provide a range in which states such as Connecticut may attribute income between spouses in the plaintiff class. Although the interpretation of a statute by the

responsible federal agency is entitled to substantial weight, *Shea v. Vialpando*, 416 U.S. 251, 262 n. 11, 94 S.Ct. 1746, 40 L.Ed.2d 120; *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371; *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), such interpretation is not conclusively binding. Here in particular, the agency's interpretation of that language in § 1396a(a)(17)(D) does not preclude the Court from construing the reasonableness requirement in § 1396a(a)(17)(C) in such a way as to limit the breadth of the agency's construction.

**17.** Conn.Gen.Stat. §§ 17–320 *et seq.*

utes reinforces the cases for separate individual consideration of spouses in the plaintiff class, since they provide the Commissioner with a remedy to employ in cases of unwarranted neglect, where, for example, a wealthy individual refuses to support an institutionalized spouse, even though he or she would be financially able to do so.[18]

A further consideration is whether or not the SSA "compulsory legal process" provision, 42 U.S.C. § 407, also affects the state's income attribution regulation.[19] The said provision prohibits the invasion of any "monies or rights" payable under the SSA through "execution, levy, attachment, garnishment, *or other legal process* (emphasis supplied)." In *Philpott v. Essex County Welfare Board*, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973), the Supreme Court held, in a plainly worded, unanimous opinion, that a state may not seek to attach lump sum retroactive benefit payments made to Social Security recipients. *See also Johnson v. Harder*, 512 F.2d 1188 (2d Cir. 1975) (provides analogy to present case).

The defendant Commissioner argues here that "legal process" has not been employed in this instance, since it is the state's approach to reduce an institutionalized spouse's Medicaid benefits in anticipation of contributions from the non-institutionalized spouse, rather than to make initial payments out of state funds and then seek recovery through legal means from the liable relative. Any distinction between these two approaches is more artificial than real, however. Indeed, if anything the present system is the more coercive, since it threatens the liable relative with the imminent probability that his or her spouse will be immediately evicted from the nursing home if contributions are not promptly forwarded. Such overwhelming administrative coercion is not beyond the meaning of the term "other legal process" in § 407. *See, e. g., Randle v. Beal*, Civil Action No. 73–1709

(E.D.Pa. May 17, 1976), *rev'd on other grounds sub nom. Fanty v. Dept. of Public Welfare*, 551 F.2d 2 (3d Cir. 1977).

Nor can it reasonably be argued that a ruling favorable to the plaintiffs under § 407 in this case will open the floodgates to abuse in related situations; for example, where a couple is not separated by institutionalization, but merely refuses mutual support out of Social Security monies. A state does not transgress the statute if it requires that benefit monies be applied for their intended purpose, which, in the case of married elderly individuals living together in a single household, would be household upkeep and collective support.

Connecticut's arbitrary interspousal income attribution regulation, DSS Policy Manual, Vol. III, ¶ D–245, § 1.b, thus violates the restrictive conditions imposed on state Medicaid plans in the SSA, 42 U.S.C. § 1396a(a)(17), and likewise transgresses the SSA compulsory legal process provision, 42 U.S.C. § 407. Once a couple otherwise eligible for medical benefits becomes actually separated on a non-temporary basis, because of the institutionalization of one spouse for health reasons, such a couple's income and resources shall be considered separately in assessing Medicaid eligibility.

The parties shall submit an appropriate order within ten (10) days.

SO ORDERED.

---

**18.** Nothing in the SSA precludes a state from exercising its financial responsibility laws in a situation of this kind. *See, e. g.*, 42 *Fed.Reg.* 2684, 2686 (comment 6).

**19.** Since the main holding in this memorandum is sufficient to provide the plaintiffs complete relief, the following discussion is by way of a "lesser included holding," and should be so interpreted.